## William R. McCoy, Appellee, v. Chicago & Alton Railroad Company, Appellant.

1. MASTER AND SERVANT, § 721*—*when existence of fellow-servant relation is question of law for the court.* Whether the evidence establishes the relation of fellow-servants within the definition thereof is ordinarily a question of fact for the jury, and it is only when the facts are undisputed, or so conclusively shown that reasonable minds must reach the same conclusion therefrom, that the court is privileged to pass upon it as a question of law.

2. MASTER AND SERVANT, § 577*—*burden of proving relation of fellow-servants.* The burden of proving the relation of fellow-servants existed is upon the master even though such relation is negatived in the declaration.

3. MASTER AND SERVANT, § 350*—*assumption of risk.* A servant does not assume, as an incident to his employment, the risk and hazard of the negligence of other employees not his fellow-servants.

4. MASTER AND SERVANT, § 729*—*when question whether members of switching crews are fellow-servants for jury.* Whether members of different switching crews are fellow-servants, *held* under the evidence to be a question for the jury.

5. MASTER AND SERVANT, § 759*—*when position of switchman on car not contributory negligence as matter of law.* Where a foreman of a switching crew was riding on the end of a steel hopper car and his legs were injured by coming in contact with a car, which was setting on a switch track and was not in the clear, *held* that the position in which he was riding and his failure to see the car on the switch track was not contributory negligence as a matter of law, but that such question was for the jury.

6. MASTER AND SERVANT, § 611*—*admissibility of evidence.* Objections to questions which simply called for conclusions of a witness and his reasons for not warning plaintiff of his danger and an objection to an offer to prove what the witness assumed plaintiff would see and what the supposed plaintiff would do, *held* not erroneously sustained.

7. MASTER AND SERVANT, § 796*—*when requested instruction properly refused as inapplicable to pleading.* Requested instructions telling the jury, in substance, that all the members of the switching crew of which plaintiff was foreman were fellow-servants and that if the negligence of any member thereof was the proximate cause of the injury plaintiff could not recover, *held* properly refused, where the gravamen of a count in the declaration was the negligence of de-

*See Illinois Notes Digest, Vols XI to XV, and Cumulative Quarterly, same topic and section number.

fendant in employing an incompetent servant as a member of the switching crew.

8. MASTER AND SERVANT, § 796*—*when requested instruction properly refused.* Requested instructions stating that plaintiff cannot recover if his injuries were caused by the negligence of fellow-servants, *held* not improperly refused, where no instruction was given or offered attempting to define what constitutes the relation of fellow-servants.

9. DAMAGES, § 122*—*when $15,000 for injury to both legs not excessive.* A verdict of $15,000 for an injury to the legs of a foreman of a switching crew *held* not excessive, where the flesh of his left leg was more or less torn from above the knee to the ankle and both bones of right leg were broken below the knee, and necessitated amputation five inches below the knee.

10. APPEAL AND ERROR, § 1633*—*when improper remarks of counsel not reversible error.* Improper remarks of counsel in his argument *held* not to be of such a character as to be cause for reversal, where an objection to the remarks was sustained, the jury instructed to disregard them and counsel disclaimed before the jury any intention to mislead them.

Appeal from the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding. Heard in this court at the October term, 1911. Affirmed. Opinion filed May 5, 1914. Rehearing denied June 25, 1914. *Certiorari* allowed by Supreme Court.

BRACKEN & YOUNG, for appellant; SILAS H. STRAWN, of counsel.

DEMANGE, GILLESPIE & DEMANGE, for appellee.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

Appellant prosecutes this appeal to reverse the judgment of the Circuit Court entered against it in favor of appellee for $15,000, in an action on the case for personal injuries.

The declaration consists of four counts. The first alleges, with the usual and necessary averments, in substance, that appellant by its servants, not fellow-servants of appellee, negligently placed a flat car on a switch track in such close proximity to the intersec-

tion thereof with another track that cars passing over the latter could not clear said flat car, and by reason of which appellee, while riding on a car traveling over the latter track in the performance of his duties, using due care for his own safety, was crushed between the car on which he was riding and said flat car and injured. The second count alleges in substance that there was a rule or custom of the members of the switching crew operating in appellant's yards to warn each other of such dangers, of which rule and custom appellant had notice, and that appellant negligently employed an incompetent switchman who did not know of such rule and custom, and who saw the danger but negligently failed to warn appellee thereof. The third and fourth counts are substantially the same as the first count. The plea of general issue was filed to the whole declaration.

The points most seriously urged by appellant are, that appellee was guilty of contributory negligence, that he assumed the risk and that the negligence in placing said flat car in such position was that of fellow-servants.

The questions of contributory negligence and assumed risk under the facts in this case are closely allied, and a proper disposition of them suggests first the consideration and determination of whether the evidence establishes as a matter of law that the negligence which caused the injury was that of fellow-servants.

The city of Bloomington is the junction point of the Chicago, Kansas City and St. Louis branches of appellant's railroad system. Extensive switch yards are there located for the purpose of assembling and breaking up trains of cars which arrive from the west, northeast and southwest over these different branches. These switch yards extend from a point somewhat south of Bloomington north for a distance of about three

and a half miles to a point near the town of Normal. They are located on either side of the main tracks of appellant's road and at some points are fifteen tracks in width. They are divided into what are designated as the east and west yards and are commonly called in the testimony train yards. From these train yards also extend switch tracks running to numerous private industries located in the vicinity thereof. The switching in the train yards is usually performed by two switch engines each manned with a switching crew, called a train yards crew. One engine and crew operate in the east train yard and one in the west train yard. A third, or extra train yards engine, spoken of as a tramp engine, and crew, at times assists the two regular train yards engines and crews in both the east and west yards, and is also used in hauling cars of merchandise to the private switch tracks of the various Bloomington industries located along appellant's right of way. This latter work is commonly called outside work. All the train yards crews worked under the orders of the yardmaster, John Connors, and the superintendent of transportation, Patrick Mulhern.

North and west of the train yards at the western limits of Bloomington appellant maintains and operates the principal repair shops of its system. They consist of many large buildings and in connection therewith are independent switch yards, which are commonly called shop yards. The shops and shop yards cover approximately eighteen or twenty blocks in area. The switching in the shop yards is performed by a switch engine with a crew called the shop yards crew. This crew works under the orders of the superintendent of machinery, Patrick Maher. The shop yards are connected with the train yards by a single track or lead, which runs from the west train yards to the gate at the shop yards, at which point it connects with the tracks of the shop yards.

McCoy v. Chicago & Alton R. Co., 188 Ill. App. 103.

There is evidence tending to show that when cars were received in the train yards destined for the shop yards, a train crew would place such cars on the shop yards lead, near the entrance to the shop yards, from which place the shop yards crew would take them to the shops within the yards; that at such times it was unnecessary and unusual for the two crews to meet. The evidence further tended to show that when cars were to be delivered from the shops to the train yards, they were set out on the tracks by the shop yards crew, which acted independently of the train yards crews, and that this was usually done when the latter crews were in distant parts of the train yards; that occasionally when cars of material were needed in the shop yards, and their delivery by the train yards crews was delayed, the shop yards crew would take them from the train yards to the shops; that the shop yards crew spent almost all of its time within the shop yards; that the train yards crews performed no duties in the shop yards, nor with the shop yards crew, and *vice versa;* that there was no rule or regulation of appellant governing a mutual action of the crews of the two departments, and that these crews seldom met and when they did it was by mere chance. Occasionally in times of emergency, when the train yards crews were rushed with work, by special order, the shop yards crew assisted them, but at such times the shop yards crew became a train yards crew, and subject to the orders of the officers controlling the train yards, and did not act in its capacity as a shop yards crew.

One of the tracks in the train yards was called the McCarthy track. Another track therein, called old track No. 1, runs alongside of it for some distance and connects with it. The McCarthy track will hold but six average cars, and leave the cars in the clear.

On the morning of the accident six cars were standing on this track when the shop yards crew pushed a seventh car from the shop yards through the switch

on to the south end of the McCarthy track. The north car of the six standing on the track was thereby moved north towards the junction of said track with old track No. 1 so that the northeast corner of said north car stood not more than eighteen inches from the west rail of old track No. 1. At this distance it would permit some cars to pass on the latter track, but would scrape the sides of others. The evidence further tended to show that it was the practice and custom to leave cars on the switch tracks so they would clear cars passing on adjoining tracks and that it was unusual not to do so. Of course, this must necessarily have been so or the business in the yards could not have been carried on.

Appellee generally was a member of the west train yards crew, but when it became necessary to use the extra or tramp engine he acted as foreman of the crew attached to that engine. On the morning in question he went to work at seven o'clock with the west train yards crew, and about nine o'clock, under orders, took charge of the extra train yards engine and crew, and while riding on the sill of a steel hopper car, which his engine was hauling on old track No. 1, with his back towards the car, his legs hanging over the sill and occupied in reading his written orders, as the hopper car passed the car on the McCarthy track his legs were caught and crushed between the corner thereof and the car on which he was riding.

It must be conceded that the leaving of the flat car on the McCarthy switch in the position mentioned by the shop yards crew was negligence, but appellant contends that the members of that crew and appellee were fellow-servants. Whether the evidence establishes the relation of fellow-servants within the definition thereof is ordinarily a question of fact for the jury to determine, and it is only when the facts are undisputed, or so conclusively shown that reasonable minds must reach the same conclusion therefrom, that the

court is privileged to pass upon it as a question of law. The burden of proving that such relation existed was upon the defendant, even though such relation is negatived in the declaration. *Chicago & A. R. Co. v. House,* 172 Ill. 601; *Hartley v. Chicago & A. R. Co.,* 197 Ill. 440. It has long been established as the law in this State that servants of a common master cannot be held to be fellow-servants, so as to absolve the master from liability for an injury to one caused by the negligence of another unless they directly co-operated with each other in a particular business as distinct from indirect co-operation of the general business of the master, or that their general duties must bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution. *Lyons v. Ryerson,* 242 Ill. 409; *Linquist v. Hodges,* 248 Ill. 491. From the evidence in this case it cannot be said that all reasonable minds must come to the same conclusion that the relation of fellow-servants existed between said respective crews. Their duties were separate and distinct, they were operating under different departments and received their orders from different officers. The officers controlling the crews in one department had no control, authority or jurisdiction over the crews in the other department. The evidence also tended to show that in the performance of their respective duties they seldom met, and if they did it was by chance and not by reason of any direct co-operation in any particular business. At least it was not undisputed that there was a direct co-operation between them, nor that in the performance of their duties they were brought into habitual association. It was for the jury to determine from all the evidence, as a question of fact, whether such relation existed, and its verdict is conclusive on this question in this court. The facts in this case are substantially analogous to those in the case of *Hartley v. Chicago & A. R. Co., supra.*

The jury having found that the relation of fellow-servants between appellee and the members of the shop yards crew did not exist, the contention that appellee assumed the risk of the negligence of the latter crew in leaving the car in the place in question cannot be sustained. Appellee did not assume, as incident to his employment, the risk and hazard of the negligence of other employees of appellant, who were not his fellow-servants. *Illinois Third Vein Coal Co. v. Cioni*, 215 Ill. 583.

It is further insisted that appellee was guilty of contributory negligence, (1) in taking the position he did on the hopper car; (2) in failing to see the flat car on the McCarthy track; (3) in failing to hear the warnings given; (4) in examining his orders and failing to anticipate the danger and be on the lookout therefor.

When appellee was directed to take charge of the extra train yards crew as foreman he was ordered to place certain cars then in the train yards on the private switches of certain industries to which they were consigned. These orders were written on pieces of cardboard and informed him where the cars would be found in the yards and to whom consigned. At the same time he was verbally ordered by the yard-master, Connors, to first take five cars of coal to the coal chute to be used by the engines of the transportation department. Appellee proceeded with his engine to the place where he was to get the coal cars, and after he and his crew had done the switching necessary to separate the five coal cars wanted from the others to which they were attached, his engine hauling said coal cars proceeded slowly south over old track No. 1 towards the McCarthy track. Appellee mounted the last car as it passed him. This was a steel hopper car with a large open space under each end. Appellee sat underneath the hopper on the sill at the end of the car with his legs hanging down on the outside over the sill, and proceeded to

examine the cards containing his orders as to the outside work he was to do immediately after leaving the coal cars at the chute. While thus occupied his train approached the McCarthy track, and when he reached the flat car standing on that track his legs were caught and injured.

There is evidence tending to show that appellee in the work of getting out the coal cars looked south in the direction of the McCarthy track, and that a man by the name of Marhl standing some distance away, also another man, one of his own crew, shouted to him as he approached the McCarthy track. Appellee testified that he at no time saw the position of the flat car on the McCarthy track, nor heard any warnings until he was almost to said car when he tried to throw up his legs, but the car caught them before he could avoid the danger.

The law did not require appellee to ride on any particular car, nor in any particular part of any car. All that he was bound to do was to use such ordinary care for his safety in the performance of his duties as a reasonably prudent person would use under the same circumstances. His position on the car did not unnecessarily expose him to any of the usual, ordinary or known risks or hazards of his employment. He had a right to assume that the shop yards crew had not negligently left any cars too close to the track over which he was traveling. It was not negligence *per se* for him to ride in said position, neither was it for him to fail to see the car, to hear the warnings nor to read his orders. Whether these facts in this particular case constituted negligence on his part which contributed to his injury was a question for the jury to determine by considering them in connection with all the other facts and circumstances shown by the evidence, and we cannot hold that he was guilty of contributory negligence as a matter of law.

The only criticism made to the court's rulings on the admission of evidence is to the sustaining of objec-

tions to six questions propounded to the witness Ryan. All these questions simply called for conclusions of the witness, and his reasons for not warning appellee of his danger. Following these objections appellant made a long offer of proof to which an objection was sustained. By this appellant offered to prove what the witness *assumed* appellee could see, and what he *supposed* appellee would do. There was no error in sustaining the objections to said questions or to the offer of proof.

The assignment of error in regard to the instructions is confined to the refusal of the court to give the fifth, sixth, seventh and tenth offered by appellant. The fifth instructs the jury in substance that all the members of the switching crew, of which appellee was foreman, were fellow-servants, and that if the negligence of any member thereof was the proximate cause of the injury, appellee could not recover. The gravamen of the second count of the declaration was the negligence of appellant in employing an incompetent servant as a member of his switching crew. The instruction goes to the whole declaration, and was inapplicable to the second count. The sixth, seventh and tenth all state that appellee cannot recover if his injuries were caused by the negligence of fellow-servants. No instruction was given or offered attempting to define what constitutes the relation of fellow-servants. The definition of fellow-servants is for the court, and it is for the jury to find whether the relation exists within the definition, from the facts proven. *Hartley v. Chicago & A. R. Co., supra.* These instructions leave it for the jury to determine who, as a matter of law, might be fellow-servants. It is error to give such instructions without defining the meaning of fellow-servants. *Chenoweth v. Burr,* 242 Ill. 312. The court properly refused them.

The evidence tended to show that the flesh of the left leg was more or less torn from above the knee

to the ankle, and that both bones of the right leg were broken below the knee. Several efforts were made to make the bones of the right leg unite by wiring them together, but these operations were unsuccessful. Effort was made to cause them to knit by irritation, with a similar result. Silver plates were then used to attach the broken ends together, and these did not succeed. Finally the leg was amputated five inches below the knee. During these various operations appellee was confined to the hospital from time to time about thirty weeks. The evidence further tends to show that the left leg also became weak, and that at the time of the trial, twenty-two months after the injury, it was necessary to wear braces thereon, and the use of a wheeled chair was the only means by which appellee could get about. He was thirty-five years of age, earning about $100 per month at the time of his injury, and up to the time of the trial had been unable to work. The verdict is large, but the injuries are severe, and we do not think under all the evidence the damages are excessive.

Criticism is made to some of the remarks of counsel for appellee in his argument to the jury. The remarks objected to were improper, but the court promptly sustained an objection thereto and the jury were instructed to disregard them, and counsel disclaimed before the jury any intention of attempting to mislead them thereby, and we do not think they were of such character that, under these circumstances, should cause a reversal of the judgment.

The judgment of the Circuit Court will be affirmed.

*Affirmed.*